UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――

UNITED STATES OF AMERICA,

      v.

MATTHEW WHITE,

      Defendant.

―――――――――――――――――――――――

**25-CR-260-RJA-JJM**

**NOTICE OF MOTION**

| | |
|---|---|
| **MOTION BY:** | James E.B. Bobseine and Timothy P. Murphy, Assistant Federal Public Defenders. |
| **DATE, TIME & PLACE:** | Before the Honorable Jeremiah J. McCarthy, United States Magistrate Judge, Robert H. Jackson United States Courthouse, 2 Niagara Square, Buffalo, New York. |
| **SUPPORTING PAPERS:** | Memorandum of Assistant Federal Public Defenders James E.B. Bobseine and Timothy P. Murphy, dated July 17, 2026. |
| **RELIEF REQUESTED:** | |

1. Dismiss Indictment
2. Dismiss Count 2
3. Bill of particulars
4. Discovery
5. Disclosure of *Brady/Giglio* information
6. Disclosure of informant information
7. Disclosure of 404(B), 608, 609 evidence
8. Early disclosure of Jencks Act material
9. Preservation of rough notes
10. Leave to make further motions

**DATED:**                                    Buffalo, New York, July 17, 2026

*James E.B. Bobseine*
*Timothy P. Murphy*
Assistant Federal Public Defender
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York 14202
James_Bobseine@fd.org
Timothy_Murphy@fd.org


**TO:**    Evan K. Glaberson
           Assistant United States Attorney

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

MATTHEW WHITE

Defendant.

---

**25-CR-260-RJA-HKS**

**MEMORANDUM**

The defendant, Matthew White, respectfully submits, through his attorneys, this memorandum in support of the following pretrial motions.

## I. MOTION TO DISMISS INDICTMENT BASED ON FIRST AMENDMENT VIOLATIONS

Mr. White challenges the constitutionality of 18 U.S.C. §§ 115(a)(1)(B) and 875(c). Section 115 is constitutionally overbroad and both counts in the indictment are unconstitutional as applied to Mr. White's prosecution. In sum, Mr. White is entitled to express criticism of the government in a manner that accounts for the unique context created by communicating through social media.

### A. Mr. White Has Been Indicted on Two Counts of Communicating a Threat on Social Media.

On January 8, 2026, Mr. White was arraigned on a two-count indictment. *See* ECF Nos. 17 (indictment) & 20 (arraignment). Mr. White pleaded not guilty to both counts. *See* ECF No. 20. Mr. White was indicted with threatening to assault and murder a federal law enforcement officer and interstate communication with threat to injure a person. Setting aside the factual ambiguity in Count 1[1], the government has alleged that Mr. White threatened the

---

[1] As discussed in the Motion for Bill of Particulars below, Count 1 does not specify the content or medium of Mr. White's alleged threat, and does not identify the target of the alleged threat beyond his or her initials (B.G.) and the federal agency (DHS) he or she works for.

same law enforcement officer ("B.G.") on April 30, 2025, through a social media post, spread over two separate counts.

Count 1 (18 U.S.C. § 115(a)(1)(B)) alleges that:

> On or about April 30, 2025, in the Western District of New York, the defendant, MATTHEW WHITE, did threaten to assault and murder B.G., a Federal law enforcement officer, employed by the Department of Homeland Security, with the intent to impede, intimidate, and interfere with such Federal law enforcement officer while engaged in the performance of his official duties, and with the intent to retaliate against such Federal law enforcement official on account of the performance of his official duties.

Count 2 (18 U.S.C. § 875(c) *(emphasis added)*) alleges that:

> On or about April 30, 2025, in the Western District of New York, the defendant, MATTHEW WHITE, knowingly and willfully did transmit in interstate and foreign commerce, a communication, that is a post on the internet social networking site "X" (formerly known as "Twitter"), which communication contained threats to injure the person of another, specifically B.G., an individual known to the Grand Jury, by stating "I can't wait to put a bullet into this guy's brain, but first his children."

(emphasis added)[2].

### B. The First Amendment Limits Statutory Restrictions on Speech.

In the face of congressional regulation, the protection of the First Amendment right to free and robust public expression has been described in plain terms. Federal statutes must be interpreted "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Watts v. United States*, 394 U.S. 705, 708 (1969) (recognizing speech threatening the President at a public rally as protected by the First Amendment) (citations

---

[2] Emphases in this memorandum are added, unless otherwise noted.

omitted). This "profound national commitment," the Supreme Court has observed, will necessarily lead to use of "language of the political arena, like the language used in labor disputes, . . . [that] is often vituperative, abusive, and inexact." *Id.*

"The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358, 364-366 (2002) (striking as facially unconstitutional a cross-burning statute including a prima facie evidence provision ignoring contextual factors). Put another way, the First Amendment "ordinarily denies a State the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence." *Black*, supra at 358 (internal citation omitted). As Mr. Justice Harlan observed:

> The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections.

*Erznoznik v. Jacksonville*, 422 U.S. 205, 209-210 (1975).

The unprotected features of certain words, despite their verbal character, reveal essentially a "nonspeech" element of communication. *R.A.V. v. St. Paul*, 505 U.S. 377, 383, 386, 392 – 393 (1992) (striking as facially unconstitutional a cross-burning ordinance). Such communicative content embodies "a particularly intolerable (and socially unnecessary) mode of expressing **whatever** idea the speaker wishes to convey." *R.A.V.*, supra at 393 (emphasis in original). However, "[t]he government may not regulate use based on hostility—or favoritism—towards the underlying message expressed." *R.A.V.*, supra at 386.

The areas of non-protected classes of speech are "well-defined and narrowly limited." *Black*, supra at 358, citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 – 572 (1942); *Counterman v. Colorado*, 600 U.S. 66, 73 (2023). These "restrictions upon the content of speech" exist only "in a few limited areas, which are 'of such slight social value as a step to truth that any benefit . . . from them is clearly outweighed by the social interest in order and morality.'" *Black*, supra at 358-359, citing *R.A.V.*, supra at 382 – 383 and *Chaplinsky*, supra at 572. There is no exception in the First Amendment allowing for proscription of violent language in general. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 792–93 (2011) (distinguishing violent speech from obscene speech).

### C. Legal Standard Regarding Overbreadth Challenges.

"There are two quite different ways in which a statute may be considered invalid 'on its face' — either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'" *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 127 (2d Cir. 2014) (internal citations). "A law is unconstitutionally overbroad if it punishes a **substantial amount** of protected free speech, judged in relation to its plainly legitimate sweep." *Sorrell*, 758 F.3d at 127, n.8 (emphasis added), citing *United States v. Farhane*, 634 F.3d 127, 136 (2d Cir. 2011) (quotation marks and alteration omitted).[3] An overbroad law can never be validly enforced unless a limiting construction is available. *Sorrell*, 758 F.3d at 127, n.8, citing *Farhane*, supra.

---

[3] "In the First Amendment context, … th[e Supreme] Court recognizes "a second type of facial challenge," whereby a law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal citation omitted).

As a result, a party may challenge a law as being overbroad even if a narrower law might have validly prohibited her conduct. *Sorrell*, supra. Moreover,

> [t]he Court has altered its traditional rules of standing to permit—in the First Amendment area—attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity. . . . **Litigants**, therefore, **are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression**. . . . In such cases, it has been the judgment of this Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes. Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations. . . .
>
> The consequence of our departure from traditional rules of standing in the First Amendment area is that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression. . . . It has been employed by the Court sparingly and only as a last resort. Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute.

*Broadrick v. Oklahoma*, 413 U.S. 601, 612 – 613 (1973) (emphasis added and internal citations omitted); *see also Brokamp v. James*, 66 F.4th 374, 389-390 (2d Cir. 2023). [4]

---

[4] *See also Erznoznik*, supra at 216 ("Th[e Supreme] Court has long recognized that a demonstrably overbroad statute or ordinance may deter the legitimate exercise of First Amendment rights. Nonetheless, when considering a facial challenge it is necessary to proceed with caution and restraint, as invalidation may result in unnecessary interference with a state regulatory program.") (internal citations omitted).

### D. Only "True Threats" May Be Statutorily Proscribed and Criminally Prosecuted.

True threats are not protected under the First Amendment. *Counterman*, 600 U.S. at 72-73. Indeed, "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Black*, supra at 359, citing *Brandenburg* v. *Ohio,* 395 U.S. 444, 447 (1969). An intellectual cousin of the so-called "fighting words" class of unprotected speech, the First Amendment also permits the government to prohibit a "true threat." *Black*, supra at 359, citing *Watts*, supra at 708 (other internal citations omitted). Further,

> **"[t]rue threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals** . . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protects individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." . . . **Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death**.

*Black*, supra at 359-360, citing *Watts*, supra at 708 and *R.A.V.*, supra at 388.[5]

True threats "are serious expressions conveying that **a speaker** means to commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (cleaned up). The question, therefore, is whether a reasonable person would perceive **the speaker's intent** to inflict harm. *See, e.g., United States v. Kelner*, 534 F.2d 1020, 1026 (2d Cir. 1976) ("the crime charged is not that

---

[5] Moreover, "[t]he "true" in that term distinguishes what is at issue from jests, "hyperbole," or other statements that when taken in context do not convey a real possibility that violence will follow (say, "I am going to kill you for showing up late"). . . . *Counterman*, supra at 74, citing *Black*, supra at 359-360, *Watts*, supra at 708, and *Elonis v. United States*, 575 U.S. 723, 733 (2015).

appellant was inciting others to . . . [political violence] but that *he himself was* threatening to do so."). This Circuit recognizes the "true threat" standard to be "an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (internal citations omitted).[6] Defendant Turner, for instance, was ultimately convicted, not for an editorial opinion about the three judges he commented on, but for threatening their lives with the intent the statute required. *Id*. at 420. A defendant charged with Section 875(c) must know the content, context, and threatening nature of the communication in question. *See Elonis*, 575 U.S. at 737-741 (rejecting reasonable person standard for listener in interpreting "true threat" issue in Section 875(c) prosecution and requiring *mens rea* on part of speaker).[7]

*Counterman* addressed the gap left by *Elonis* regarding how low a defendant's required *mens rea* may be for a true threat to be proven. In sum, a defendant must be subjectively aware of the character and threatening nature of the communication in question. *Id*. at 72-73, 76-78. Recklessness is sufficient, **only if** the government shows the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence by the recipient. *Counterman*, supra at 69, 78-79, 82, 96 – 99.

### E.  **Mr. White's indictment**

Mr. White is alleged to have threatened a federal law enforcement officer on April 30, 2025 by posting comments on the social media platform, X.

---

[6] *Turner* was decided two years before *Elonis* and ten years before *Counterman* (both of which addressed threatening messages posted and/or sent via the social media platform Facebook).

[7] *Turner* held that instructing a jury that the government need only prove that a reasonable person would regard the defendant's communication as a threat is erroneous. *Id*. at 740.

1. <u>Section 115(a)(1)(B) is overbroad</u>

The prohibition under Section 115(a)(1)(B) casts an overbroad net encompassing the very political speech Mr. White regularly participated in. The phrase under Count 1, "while engaged in the performance of his official duties, and with the intent to retaliate against such Federal law enforcement official on account of the performance of his official duties" directly and unduly impedes public criticism of ICE agents. The government is prosecuting Mr. White at the precise moment when many Americans believe such public discourse is critical for maintaining our free society.[8]

Understanding the nature of the expression requires understanding (to the level of recklessness) that the listener may reasonably be placed in fear. *Counterman*, supra at 76-77 (discussing same). As Justice Sotomayor recognized in her *Counterman* concurrence, **context is everything**. *Id.* at 84, 101; *see also id*. at 103 (championing "a precise and demanding form of recklessness"). Indeed, true threats "encompass a narrow band of intentional threats. Especially in a climate of intense polarization, it is dangerous to allow criminal prosecutions based solely on an amorphous recklessness standard." *Id*. at 104. These concerns are magnified in the context of communicating via social media, because "[o]ur society's discourse occurs more and more in "the 'vast democratic forums of the Internet' in general, and social media in particular." *Counterman*, 600 U.S. at 87.

In 2017, nearly 10 years ago, the Supreme Court observed that the Internet, and especially social media, had clearly become "the most important place[ ] . . . for the exchange

---

[8] *See, e.g.*, Armed Conflict Location & Event Data ("ACLED") website: K. Doyle and C. Murillo, *The migration debate on the street: Four key things to know from global data on protests*, Feb. 13, 2026, https://acleddata.com/report/migration-debate-streets-four-key-things-know-global-data-protests (site visited, June 1, 2026); see also The Guardian website: Richard Luscombe, *Half of Americans back abolishing ICE amid Trump crackdown, poll finds*, March 4, 2026, https://www.theguardian.com/us-news/2026/mar/04/ice-trump-immigration-poll (site visited, June 1, 2026).

of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). This remains as true today as in 2017.[9] Social media is where political candidates court voters,[10] Americans learn about social and political issues,[11] users gather to discuss and debate headline news,[12] the federal branches issue press releases,[13] activists engage in political protest,[14] and the government hear citizen petitions.[15] In short, social media is a modern public forum.

It is also true that the unique features of social media platforms affect how a communication is transmitted, to whom it is transmitted, and how that communication is understood. Twitter, for example, allows users to "send messages of limited length to the public" through posting their own messages, respond to messages ("replying"), republish

---

[9] A 2021 study showed that 72 percent of U.S. adults used least one social media site, including 69% using Facebook and about one-quarter using Twitter. Pew Research Center, *Social Media Fact Sheet* (April 7, 2021), https://www.pewresearch.org/internet/fact-sheet/social-media/ (visited July 11, 2026). A 2025 study showed that U.S. Adults' broad social media use continues, with more than half using YouTube and Facebook each day. Pew Research Center, *Americans' Social Media Use 2025* (Nov. 20, 2025), https://www.pewresearch.org/internet/2025/11/20/americans-social-media-use-2025/ (visited July 11, 2026)

[10] *Just How Online Was This Election?*, Madison Malone Kircher, The New York Times (Nov. 2, 2024), https://www.nytimes.com/2024/11/02/style/harris-trump-viral-internet-moments.html (visited July 11, 2026).

[11] Pew Research Center, *42% of social media users say the sites are important for them getting involved with political, social issues* (Sept. 16, 2025), https://www.pewresearch.org/short-reads/2025/09/16/42-of-social-media-users-say-the-sites-are-important-for-them-getting-involved-with-political-social-issues/ (last accessed July 15, 2026).

[12] *See* Pew Research Center, *Social Media and News Fact Sheet* (Sept. 25, 2025) (53 percent of U.S. adults get news from social media) and Pew Research Center, News Platform Fact Sheet (Sept. 25, 2025) (86 percent of U.S. adults say they get news from digital devices).

[13] *See, e.g.,* official X accounts for the White House (https://x.com/WhiteHouse), House of Representatives (https://x.com/congressdotgov), and U.S. Courts (https://x.com/uscourts) (each accessed July 11, 2026).

[14] John Henry Smith, *How has social media changed protest movements? A sociologist weighs in* (Apr. 30, 2024), https://www.nhpr.org/2024-04-30/social-media-protest-college-campus-pro-palestinian-effective (last accessed July 13, 2026).

[15] The House of Representatives maintains an online list of the X handles of members, https://pressgallery.house.gov/member-data/members-official-x-handles-119th-congress (last accessed July 11, 2026); *see also Packingham*, 582 U.S. at 105 (observing that all state governors and federal congressmen had Twitter accounts to engage with users).

others' messages ("retweeting"), or acknowledge or approve others' messages (by "liking"). *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019). Further features include "following" or direct messaging other Twitter users. *Id.* Notably, since the Second Circuit summarized Twitter's functions in 2019, the platform has been renamed "X" and its functions significantly altered. *See, e.g.*, Siladitya Ray, *10,000 Characters, Italic Fonts And Regular AMAs With Elon Musk Among New Perks For Twitter Blue Subscribers*, Forbes.com (April 14, 2023).[16] These changes to a site with previously stable functionality underscore the instability and dynamism of online communication by social media.

Snapchat, meanwhile, allows users to post photos and videos that disappear after a time, as well as limit those who view one's posts. *See Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 184 (2021). Facebook's unique features were described in *Counterman*, which involved the sending of hundreds of **direct messages** through Facebook, many of them violent, despite the recipient's repeated attempts to prevent the sender from doing so using a Facebook feature known as "blocking." *Counterman*, 600 U.S. at 70.

All public forums have different ways speech may be conveyed, of course. Consider, for example, that "exemplar of pure democracy," the New England town meeting. *Curnin v. Town of Egremont*, 510 F.3d 24, 26 (1st Cir. 2007); *see also Friends of Animals, Inc. v. City of Bridgeport*, 833 F. Supp. 2d 205, 213 (D. Conn. 2011) ("the municipal stadium has replaced the town meeting hall and the public square as a gathering place for large segments of the population to engage in meaningful discourse."). Whenever and wherever people gather, words will be exchanged; this speech may be delivered from the microphone at the front of

---

[16] *See* https://www.forbes.com/sites/siladityaray/2023/04/14/10000-characters-italic-fonts-and-regular-amas-with-elon-musk-among-new-perks-twitter-blue-subscribers/ (visited July 9, 2026).

the room, muttered under one's breath, yelled from the back of the room, or exchanged with a handful of individuals nearby. The point is, whatever the forum in which an allegedly proscribable communication is made, the precise context of the speech matters. *Counterman,* at 84, 101; *see also Mahanoy Area Sch. Dist.*, 594 U.S. at 191 (finding a school violated the First Amendment when it disciplined a student for a social media post sent after school hours).

Moreover, the context of social media requires, often by necessity because of the competitive, vulgar, performative, loud space in question, a bullhorn. *Counterman*, 600 U.S. at 87-89 (J. Sotomayor, concurring). Prolific participants such as Mr. White use hyperbolic language as a default. Conversations that might have occurred in person 20 or more years ago now take place in "the vast democratic forums of the Internet in general, and social media in particular." *Packingham*, 582 U.S. at 104. These "[r]apid changes in the dynamics of communication and information transmission" have utterly transformed in fundamental ways "what society accepts as proper behavior." *Ontario v. Quon*, 560 U.S. 746, 759 (2010). In this context, courts must be cautious and carefully analyze claims made by the government that a communication on social media amounts to a true threat. As Justice Sotomayor wrote:

> The risk of overcriminalizing upsetting or frightening speech has only been increased by the internet. . . . "Rapid changes in the dynamics of communication and information transmission" have led to equally rapid and ever-evolving changes "in what society accepts as proper behavior." … Different corners of the internet have considerably different norms around appropriate speech. **Online communication can also lack many normal contextual clues, such as who is speaking, tone of voice, and expression**. Moreover, it is easy for speech made in one context to inadvertently reach a larger audience. Without sufficient protection for unintentionally threatening speech, a high school student who is still learning norms around appropriate language could easily go to prison for sending another student violent music lyrics, or for unreflectingly using language he read in an online forum. "[A] drunken joke" in bad taste can lead to criminal prosecution. . . . In the heat of the moment, someone may post an enraged comment under a news story about a

controversial topic. Another person might reply equally heatedly. In a Nation that has never been timid about its opinions, political or otherwise, this is commonplace. Many of this Court's true-threats cases involve such charged political speech. … Much of this speech exists in a gray area where it will be quite hard to predict whether a jury would find it threatening. And the ubiquity of such speech raises the possibility of highly discretionary enforcement. The burdens of overcriminalization will fall hardest on certain groups. A jury's determination of when angry hyperbole crosses the line will depend on **amorphous norms around language, which will vary greatly from one discursive community to another**. Juries' decisions will reflect their "background knowledge and media consumption." . . . "**[S]peakers whose ideas or views occupy the fringes of our society have more to fear, for their violent and extreme rhetoric, even if intended simply to convey an idea or express displeasure**, is more likely to strike a reasonable person as threatening." Members of certain groups, including religious and cultural minorities, can also use language that is more susceptible to being misinterpreted by outsiders. And unfortunately yet predictably, racial and cultural stereotypes can also influence whether speech is perceived as dangerous.

*Counterman*, 600 U.S. at 87-89 (J. Sotomayor, concurring) (emphasis added).[17]

---

[17] Justice Sotomayor's other thoughts on the topic are instructive as well:

> Lest there be any doubt, the First Amendment stakes around the definition of "true threats" are high indeed. The First Amendment's mantle covers speech that is "vituperative, abusive and inexact." . . . "It might be tempting to dismiss" seemingly low-value speech "as unworthy of . . . robust First Amendment protections." Yet "[m]ost of what we say to one another lacks 'religious, political, scientific, educational, journalistic, historical, or artistic value' (let alone serious value), but it is still sheltered from Government regulation." . . . First Amendment vigilance is especially important when speech is disturbing, frightening, or painful, because the undesirability of such speech will place a heavy thumb in favor of silencing it. In response, the Court has upheld First Amendment rights in the context of gruesome animal cruelty videos, . . . cross burning, . . . hateful rhetoric in protests of the funerals of fallen soldiers, . . . and computer-generated images of child pornography . . . .

*Counterman*, 600 U.S. at 86-87 (J. Sotomayor, concurring).

As the Supreme Court has recognized recently, most relevant in this inquiry is not what the speaker conveys, but his *mens rea*, what he intends. *Elonis*, supra at 733, 736. It is critical to understand Mr. White's knowledge of the character and threatening nature of the communication; in other words, how the contents of a communication, **when viewed in context**, will be understood by a reasonable recipient of Mr. White's speech. *Id*. at 737-739; *see also United States v. Malik*, 16 F.3d 45, 50 (2d Cir. 1994) ("written words or phrases take their character as threatening or harmless from the context in which they are used, measured by the common experience of the society in which they are published.").

The government provided in discovery a selection of screenshots capturing Mr. White's X posts from late April 2025. *See* **Exhibit A**.[18] Mr. White's posts, admittedly, include language that "the overwhelming majority of people might find distasteful or discomforting," *Black*, 538 U.S. at 358, but he uses that language to comment upon legitimate topics of public discussion. Even from the curated selection of posts preserved by the federal investigation, Mr. White emerges as a person who is deeply concerned about ICE agent activity, racism, and the Fourth Amendment issue of whether ICE agents must identify themselves when seizing individuals and making an arrest. For example, in a posting on April 30, 2025, Mr. White replied to post sharing an NBC News video, "Video Shows Boy Hurling Ehtnic Slurs at Preschooler." The original post—from @LongTimeHistory—commented that "Trump has stoked Asian American hatred for years—now middle schoolers film themselves bullying 5 year old." The original post included a purported quote from the bullied kindergartner saying, "Don't hurt me! Don't do it. Save me!" Mr. White, in his reply reacting to the video,

---

[18] For ease of reference, the defense has added page numbers to the document provided by the government.

expressed anger, posting "This is reason enough to slice the ear off the administration, breeding fucking monsters." He does not refer to any specific person but directs his frustration at an entity—the current administration.[19]

A prominent piece of the public's online debate regarding important immigration-related discourse becomes collateral damage from Section 115's broad prohibitions. "[D]ebate on public issues should be uninhibited, robust, and wide open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Turner*, 720 F.3d at 420-421, citing *Watts*, supra at 708 (other internal citation omitted). Because Section 115(a)(1)(B) significantly obstructs the public's ability to carry on this important public discussion—and likely deters others from speaking out—Count 1 should be dismissed as violative of the First Amendment.

### 2. Both Counts are Unconstitutional as Applied.

The circumstances of this case—*the **context** in which the communication was made*— reveal an unconstitutional application of both Section 115(a)(1)(b) and Section 875(c). The general context in which Mr. White's speech arose (the reality of modern speech on social media) remains relevant for the as-applied analysis. The precise circumstances of Mr. White's X communications, however, make clear that Counts 1 and 2 are unconstitutional as applied. *See Watts*, 394 U.S. at 708 (finding a threat to shoot to president, when "taken in context"— including the conditional nature of defendant's statement and the reactions of those who

---

[19] In another post shared by the government, replies to an X post purportedly sharing a video of an ICE operation. The original user comments that "ICE will prosecute the 2 women in this video— who only dared to ask [undercover] agents if they had a warrant—with felony obstruction charges." Mr. White responds to the post, "Even undercover agents have to identify themselves before they make an arrest, I'd like to do that for them, I'd like to find out the name of the bigot bastard in pink and make it so it's impossible for him to even grab milk in public."

heard it—to be "political hyperbole"). The unique circumstances in Mr. White posted on X, crucially, are readily apparent from viewing Mr. White's X account.

**Circumstance #1: The content of Mr. White's X posts and X profile page indicates that he lives in Jamestown.** To join the public forum that X has become, in December 2024, Mr. White created an account and username (@MatthewWhi17466) and provided public information about himself. For example, he described himself as "into rabbit hole conversation and good vibes. funny is fantastic." He listed his location as "Jamestown, New York." On January 18, 2025, Mr. White posted photos of himself, a winter landscape, a cat, and store shelves of liquor bottles, with the caption, "Winter Friday style in Jamestown, NY!" That Mr. White lived and posted from Jamestown is obvious after even a brief review. These facts strongly suggest that he is unlikely to attack someone somewhere across the country.

Nor was there any indication from the content of the communications themselves that Mr. White could realistically carry out an attack on a federal agent located, for example, 1,500 miles away in Denver, 2,200 miles away in Las Vegas, or 2,500 miles away in Los Angeles.[20] Unlike this case, the defendant in *Turner*, by way of example, posted the work addresses, photos and maps, and otherwise demonstrated at intent to post private address information about the targeted judges in question. *See Turner*, 720 F.3d at 415-416, n.1, 418-426 (finding legally sufficient evidence to support § 115(a)(1)(B) conviction and rejecting challenge to jury

---

[20] These cities were all prominent targets of federal immigration raids in April 2025. *See Immigration raids in Colorado, both highly visible and cloaked in secrecy, rattle advocates and local authorities*, CPR News, https://www.cpr.org/2025/02/06/colorado-immigration-raids-rattle-advocates-authorities/ (visited June 30, 2026), *Reported ICE activity in Las Vegas raises alarm for immigration advocates*, NPR News, https://knpr.org/show/knprs-state-of-nevada/2025-04-24/reported-ice-activity-in-las-vegas-raises-alarm-for-immigration-advocates and *ICE raids: Latest round of arrests in Southern California*, Fox 11 Los Angeles, https://www.foxla.com/news/ice-raids-latest-round-arrests-southern-california-apr-23-2025 (visited June 30, 2026).

instructions).[21] By contrast, no reasonable person would read Mr. White's communications as a "true threat." To find otherwise would shut down public discourse when it is so badly needed in our country. [22]

**Circumstance #2: The content of the communication indicates Mr. White knows nothing about the agent's identity—or even if he *is* a federal agent.** Mr. White does not know whether the man is a federal agent (or if so, what agency he works for). He does not know the individual's name, address, location, or contact information. This is obvious from a cursory glance. Indeed, the first tweet in the X "thread" reflected this uncertainty, when a user named @HynekManeuver asked, "Can anyone identify this **so called** ICE agent?"

**Circumstance #3: The public reach of recipients of Mr. White's communications was extremely limited.** Very few people viewed the tweet that led to Mr. White's indictment—or those leading up to it. For example, on April 29, 2025, Mr. White tweeted, in response to a non-government X user, "Then understand that if your ICE agents don't show proof of identity and a signed warrant, we will kill them." Compl., at ¶ 12. The "engagement metrics" at the base of the image below show that **two people** viewed this tweet (including, presumably, whoever took a screenshot).

---

[21] The *Turner* decision did not entertain any challenges to the "on account" provision, which was charged to the jury. *Id*. at 418.

[22] As noted in defense counsel's November 6, 2025 correspondence to the government, Mr. White is one of thousands of so-called keyboard warriors who have posted on social media in this combative political environment. Yet, he is one of only a handful of people to face a federal threat prosecution since January 1, 2025, in which charges under 18 U.S.C. § 875(c) or 18 U.S.C. § 115 have been based upon public social media posts targeting U.S. Immigrations and Customs Enforcement agents. Other prosecutions involve far more, and graver, threats than Mr. White's alleged posts, and (unlike his case) include allegations that each defendant had the means to carry out violence against federal law enforcement. *See e.g., United States v. Michael D. Stover*, 25-CR-540 (N.D. Ill.); *United States v. Anthony M. Kelly*, 25-CR-81 (S.D. Ohio); *United States v. Andrew W. Stanton*, 25-CR-198 (E.D. Wis.).



Virtually no one saw this post. This is as close as a social media post can get to writing in one's diary. This is also true of Mr. White's April 30 post. Compl., at ¶ 15.



For this post, the "engagement metrics" show that zero people commented on the post, zero people retweeted the post, zero people liked the post, and only **eight people interacted** with the post in any way (including whoever viewed the post to take the screenshot).

**Circumstance #4: There's no indication Mr. White had any expectation or intent to communicate to the government, let alone the federal agent.** These messages undoubtedly contain violent language, but (as discussed in Circumstance #5), the context of the communication makes clear that these are the posts of a "keyboard warrior" expressing his deep frustration with the federal government. Take the first post, which is addressed as if Mr. White were speaking to a government official. But he was not. In fact, the X account to which he was responding, @america, was operated by a private individual user.[23] This was also true of the post that gave rise to the indictment, in which Mr. White responded to a tweet by a private user, @HynekManeuver. These posts were not made to any official and there is no basis to conclude that Mr. White expected these communications to reach any official. *Compare United States v. Ward*, 748 F. Supp. 3d 104, 107 (E.D.N.Y. 2024) (threatening statement made at a court appearance on the record). Moreover, there is no indication Mr. White knew any other X users who could plausibly be viewed as potential co-conspirators, including those who posted online and those (extraordinarily few X users) who clicked in to read the communications.

**Circumstance #5: Mr. White's April 30 post was one of many coarse, vituperative, and abusive communications in *the same X thread*.** On April 30, 2025, Mr. White posted twice on X about an individual shown in a still photo, which had been posted by another private user. *See* <u>Exhibit A</u>, at 3. But Mr. White's post did not occur in a vacuum, but rather in the context of a sprawling online conversation concerning supposed activity by ICE agents that involved hundreds of users. *See* **<u>Exhibit B</u>**.[24] A review of this online conversation shows

---

[23] *Elon Musk takes over 'America' handle on X to promote pro-Trump PAC: report*, New York Post, https://nypost.com/2024/10/07/business/musk-takes-over-america-on-x-to-promote-pro-trump-pac-report/ (visited July 15, 2026).

[24] Collected using Page Vault, which securely captures and preserves web pages. For ease of

how communication "dynamics" on social media have significantly changed behavioral expectations. Over several days, X users join the conversation simply to call an unknown person names like thug, a fascist, kidnapper, gestapo, illegal, and far worse; many call for his identity to be discovered and disclosed; still others doubt he is in fact an ICE agent. And various posts employ violent language not unlike what caused Mr. White to be charged:



Even from this small subset of posts on a single X thread, one can see that X users sometimes use their real names, and sometimes not; X users may use a real photograph or an anonymous avatar; X users may use language intended to be understood ironically or meant seriously—it is impossible to know. Ordinary rules of spelling and grammar, and norms of polite discourse, utterly disregarded. This is the context in which Mr. White posted, where he was hardly alone in feeling strong emotions, or in posting violent language about a man he

reference, the defense has identified outlined in red any posts referenced herein.

19

knew nothing about. To highlight one example, "Erin," whose handle is "@themrs805," has more than 27,000 followers, and whose has posted publicly[25] on X photos of puppies and her football-playing child, posted twice in rapid succession on April 24, 2025, declaring "Let's find [the ICE agent] and let him feel the same fear the man he is arresting feels," and then asking another user, "@TizzyEnt," (who has been accused of "doxxing,"[26] i.e., the potentially illegal release of private identifying information) to help her find "some of these thugs."



Despite Mr. White's post occurring amidst so many other similarly coarse, vituperative, and abusive communications, we are not aware of any other charges arising from the comments made about this specific incident and/or specific agent. This background matters because whether something is a "true threat" depends upon the context in which it was made. *Counterman*, 600 U.S. at 74 ("The 'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow (say, 'I am going to kill you for showing up late').").

In sum, both Count 1 and Count 2 infringe on Mr. White's First Amendment rights to express himself in public, warranting a dismissal of the indictment.

---

[25] https://x.com/themrs805?lang=en (site visited on July 14, 2026)

[26] *Meet The TikToker Exposing Homophobia And Racism Online*, David Silverberg, Complex (Oct. 7, 2024) https://www.complex.com/pop-culture/a/david-silverberg/tiktok-tizzyent-expose-homophobia-racism-edit-beyonce-meek-mill-music-videos (visited July 13, 2026).

## II. MOTION TO DISMISS COUNT 2 OF THE INDICTMENT FOR FAILURE TO ALLEGE DEFENDANT'S *MENS REA*

Mr. White moves, pursuant to Rules 7 and 12 of the Federal Rules of Criminal Procedure and the Fifth Amendment, to dismiss Count 2. This count does not allege—or provide facts sufficient to infer—that Mr. White acted with the subjective intent of communicating threats. As interpreted by the Supreme Court in *Counterman v. Colorado*, 18 U.S.C. § 875(c) requires that the government prove not only that the communication at issue would be perceived by a reasonable recipient as a true threat, but also that Mr. White sent the communication with the subjective **mens rea** of making a threat. Because Count 2 ignores this essential element of the statute charged, it must be dismissed. "The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away." *United States v. Acquest Dev., LLC*, 932 F. Supp. 2d 453, 459 (W.D.N.Y. 2013).

### A. Count 2 Alleges Mr. White Knew or Intended to Submit his Post on X but Does Not Say if He Meant it as a Threat, Which the Constitution Requires.

As discussed above, Count 2 alleges a violation of Section 875(c) through a post on X, the online social media platform. Count 2 relies upon a generic description of conduct allegedly committed by Mr. White without reference to Mr. White's **mens rea** during the alleged incident regarding the tweet itself.

> On or about April 30, 2025, in the Western District of New York, the defendant, MATTHEW WHITE, knowingly and willfully did transmit in interstate and foreign commerce, a communication, that is a post on the internet social networking site "X" (formerly known as "Twitter"), which communication contained threats to injure the person of another, specifically B.G., an individual known to the Grand Jury, by stating "I can't wait to put a bullet into this guy's brain, but first his children."

ECF No. 17, at 2. Count 2 alleges that Mr. White "knowingly and willfully" posted a message on Twitter. But each element of 18 U.S.C. § 875(c) requires a specific level of scienter.

**B. An Indictment Must Allege Every Element of a Crime to Comply with the Constitution and Statutory Law.**

Under the Fifth and Sixth Amendments to the Constitution, Federal Rule of Criminal Procedure 7(c)(1), and Second Circuit precedent, an indictment must allege every essential element of the charged offense, including judicially imposed constitutional requirements. The government's failure to do so renders the indictment fatally defective and subject to dismissal.

At a minimum, an indictment must allege each element of a charged offense. *See Hamling v. United States*, 418 U.S. 87, 117 (1974) (holding that an indictment is only sufficient if it "set[s] forth all elements necessary to constitute the offence intended to be punished"). Perfection is not required, but an indictment must capture every element of the charged crime to ensure the defendant is not, in violation of the Fifth Amendment, "convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *Russell v. United States*, 369 U.S. 749, 770 (1962); *see also United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012) ("Under the Fifth Amendment, a defendant has a substantial right to be tried only on charges presented in an indictment returned by a grand jury.").

**C. Indictment Requirements Under Federal Rule of Criminal Procedure 7(c)**

Under the Federal Rules of Criminal Procedure, an indictment must cite to the statute a defendant allegedly violated and plainly, concisely, and definitely state the essential facts constituting the offense charged. Fed. R. Crim. P. 7(c)(1). Every element must be alleged in order to "give the defendant fair notice of the charges 1 Wright & Miller Fed. Prac. & Proc. Crim. § 124 (5th ed.) § 124 (footnote omitted). Citing to the statute does not fix an indictment that fails to allege facts supporting each element of the offense. *Gonzalez*, 686 F.3d at 128. Adequate notice of the charges permits a defendant to plead former jeopardy upon prosecution and to enable him to prepare a defense. *United States v. Hernandez*, 980 F.2d 868,

871 (2d Cir. 1992). Where **mens rea** is an essential element of criminal charge, the indictment must include an allegation of that knowledge. *United States v. Berlin*, 472 F.2d 1002, 1007 (2d Cir. 1973) (because knowledge of falsity was an essential element of the charge, failure to allege such knowledge in indictment was a fatal deficiency).

### D. Statutory Elements of 18 U.S.C. § 875(c)

To establish a violation of 18 U.S.C. § 875(c), the government must establish three elements beyond a reasonable doubt:

(1) that the defendant threatened to kidnap or to injure a person, as charged in the Indictment;

(2) that the threat was transmitted in interstate (or foreign) commerce; and

(3) that the defendant transmitted the threat knowingly and intentionally.

2 Leonard B. Sand *et al.*, Modern Federal Jury Instructions-Criminal P 31.02. *See also United States v. Marseet*, No. 6:24-CR-6032 (BKS), 2026 WL 643008, at *4 (W.D.N.Y. Mar. 9, 2026). ("To establish a violation of 18 U.S.C. § 875(c), the Government must establish that a defendant intentionally transmitted a communication in interstate commerce and that he transmitted the communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat.") (internal citations omitted).

### E. Elonis v. United States and Counterman v. Colorado Impose a Constitutional Mens Rea Requirement for Threat Prosecutions.

The text of 18 U.S.C. § 875(c) does not contain an explicit **mens rea** element. *Elonis*, 575 U.S. at 734 ("The most we can conclude from the language of Section 875(c) and its neighboring provisions is that Congress meant to proscribe a broad class of threats in Section 875(c), but did not identify what mental state, if any, a defendant must have to be convicted."). As the Supreme Court observed in *Elonis*, however, "a guilty mind is a necessary element in the indictment and proof" in almost all cases. *Id.*, 575 U.S. at 734.

In *Counterman*, the Supreme Court held that the First Amendment requires, at a minimum, a **mens rea** of recklessness. *Counterman*, 600 U.S. at 82. Requiring at least recklessness protects against the chilling of protected expression while still permitting prosecution of morally culpable defendants who have consciously accepted a substantial risk of inflicting serious harm. *Id.*, 600 U.S. at 79-80. Recklessness means that the speaker is aware that his statements could be taken by the recipient as threatening violence and delivers them anyway. *United States v. Garnes*, 102 F.4th 628, 637 (2d Cir. 2024).

The Second Circuit, in interpreting this constitutional limitation, has held that the First Amendment requires that the government make two significant showings: *first*, that a defendant's words "would, objectively, convey to the listener that the threatening language represented a genuine threat," and, *second*, and that in using the allegedly unlawful words, a defendant "consciously disregarded a substantial risk that his communications would be viewed as threatening violence" by the recipient. *United States v. Garnes*, 102 F.4th 628, 637 (2d Cir. 2024) (citing *Counterman*). Thus, to pass Constitutional muster, the government must allege (and ultimately, prove beyond a reasonable doubt) that a defendant's words satisfy both the objective and subjective tests under *Counterman*.

In sum, Count 2 of the indictment must allege that Mr. White had some subjective understanding of the threatening nature of his tweet. The government does not do this.

### F. Count 2 is Facially Insufficient Because It Fails to Allege That Mr. White Consciously Disregarded a Substantial Risk that his Communications Would be Viewed as Threatening Violence.

The indictment in this case is facially insufficient because it does not allege—as required under 18 USC § 875(c)—that Mr. White consciously disregarded a substantial risk that his communication would be viewed as threatening violence by the recipient of his communications. See *Garnes*, 102 F.4th at 637. Count 2 recites the language of the statute and

leaves out the **mens rea** requirement from *Counterman*, alleging only that Mr. White knowingly and willfully transmitted a "communication contain[ing] threats to injure the person of another." ECF No. 17. To satisfy the Constitution, the indictment also needed to state either that Mr. White **intended** to threaten violence or that Mr. White **consciously disregarded a substantial risk** that the recipient would interpret his post as threatening.

### III. MOTION FOR A BILL OF PARTICULARS

Count 1 of the indictment does not sufficiently inform Mr. White of the charges against him. Pursuant to Fed. R. Crim. P. 7(f) and the Fifth and Sixth Amendments, Mr. White respectfully requests that this Court order the government to file a bill of particulars. Count 1 alleges that Mr. White violated 18 U.S.C. § 115(a)(1)(B) as follows:

> On or about April 30, 2025, in the Western District of New York, the defendant, MATTHEW WHITE, did threaten to assault and murder B.G., a Federal law enforcement officer, employed by the Department of Homeland Security, with the intent to impede, intimidate, and interfere with such Federal law enforcement officer while engaged in the performance of his official duties, and with the intent to retaliate against such Federal law enforcement official on account of the performance of his official duties.

A bill of particulars provides a defendant with the details of the charges necessary to present a defense, to avoid prejudicial surprise at trial, and to protect against a second prosecution based on the same facts. *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (collecting cases). A defendant may use Rule 7(f) "in order to identify with sufficient particularity the nature of the charge pending against him," which is essential to allow defendant to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *Bortnovsky*, 820 F.2d at 574. Crucially, a bill of particulars ensures that the defendant is tried on the basis of facts presented

to a grand jury. *See* 24 Moore's Federal Practice – Criminal Procedure § 607.07 (the government may not present at trial information materially different from that disclosed in its bill absent a court order); *see also Yeargain v. United States*, 314 F.2d 881, 882 (9th Cir. 1963).

Mr. White has rights under the Fifth and Sixth Amendments and Rule 7(f) to notice of the charges against him, to a fair trial with an opportunity to defend himself against the charges, and to be tried on a charge found by a grand jury. Count 1 does not specify the content or medium of Mr. White's alleged threat and does not identify the target of the alleged threat beyond his or her initials (B.G.) and the federal agency (DHS) he or she works for. Count 1 merely provides an approximate date of the threat (on or about April 30, 2025) and otherwise recites nearly verbatim from the statute. The tweet quoted by the government in Count 2 **suggests** that the grand jury indicted Mr. White on Count 1 based upon one tweet, but the defense cannot be made to **assume** that is the case. In the original complaint, the government included screenshots of various tweets, including one tweet on April 18, 2025, one tweet dated April 29, 2025, and four tweets from April 30, 2025. *See* ECF No. 1, at ¶¶ 9, 11 – 12, 14 – 17. The government has also disclosed to the defense additional tweets that it collected during the investigation of Mr. White.

Moreover, as discussed below in the motion for discovery, the defense has received no discovery supporting the assertions in Count 1 that B.G. was "a Federal law enforcement officer" or that he was performing his official duties. This is so even though Count 1 states that the grand jury found that Mr. White threatened B.G., "**a Federal law enforcement officer**," "**while [he was] engaged in the performance of his official duties**, and with the intent to retaliate against such Federal law enforcement official on account of **the performance of his official duties**." Notably, DHS employs about 260,000 people, of whom

80,000 are officers.[27] Lastly, it was not clear to Mr. White—and many X users with the same information and posting in the same online conversation—if the individual was in fact an ICE agent. The following X posts are simply a few examples, as highlighted in <u>Exhibit B</u>:











Indeed, the first tweet in the X "thread," or conversation, reflected this uncertainty, when X user @HynekManeuver asked, "Can anyone identify this **so called** ICE agent?" As Count 1 is written, Mr. White does not know the basis of the charge against him, cannot receive a fair trial, and cannot assess if he will be tried on a charge found by a grand jury.

Accordingly, Mr. White requests disclosure of the following particulars regarding Count 1 (18 U.S.C. § 115(a)(1)(B)):

(1) state with as much particularity as possible the content(s) of the alleged communication(s) in which Mr. White "did threaten to assault and murder B.G.";

(2) state with as much particularity as possible the date(s) on which the alleged communication(s) in which Mr. White "did threaten to assault and murder B.G." occurred;

(3) state with as much particularity as possible the identity of B.G.; and

(4) state with as much particularity as possible the official duties B.G. was engaged in "while" Mr. White allegedly threatened him, and for which Mr. White allegedly "retaliated" against him.

---

[27] *See* dhs.gov/about-dhs (visited July 11, 2026); also, as noted in n.__, supra, ICE conducted various raids all around the country in April 2025.

## IV. MOTION FOR DISCOVERY

The defense has received discovery from the government and now notifies the government regarding additional specific requests, outlined below. To the extent that these items have already been provided, the requests herein are made merely to ensure that all discovery required by Rule 16 is turned over.

Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(A)(B) & (D), Mr. White moves to compel discovery of any items or information to which he is entitled, but were not previously provided. Specifically, this request includes, but is not limited to, the following:

    a.     any and all social media collected by the government relating to the April 2025 law enforcement activity to which Mr. White responded;

    b.     any and all social media collected by the government regardless of whether the government intends to utilize the data or not, and regardless of whether it leads to further investigation in this case;

    c.     any reports, "flags," or other notifications from the social media platform X relating to Mr. White, or documents that led to such reports;

    d.     any reports, "flags," or other notifications from the social media platform X relating to users posting about the April 2025 law enforcement activity to which Mr. White responded;

    e.     any reports to law enforcement from members of the public relating to Mr. White;

    f.     any reports to law enforcement from members of the public relating to users posting about the April 2025 law enforcement activity to which Mr. White responded;

    g.     any and all audio and/or video recordings made in this case.

    h.     all reports generated from the seizure of any cellphones;

    i.     any and all photographs taken during the investigation of Mr. White;

    j.     any and all federal, state, and local police reports related to the investigation of Mr. White, his arrest, the search and seizure of his cellphone, the search of his residence, all telephone calls with Mr. White;

k.  identify all federal, state, and local law enforcement present during statements made by Mr. White, including but not limited to officers present during the June 4, 2025 interview of Mr. White and search of Mr. White's home;

l.  any and all reports and/or rough notes documenting interactions between Mr. White and members of law enforcement;

m.  a copy of any *Miranda* waiver form utilized in the case, whether signed or not;

n.  copies of any and all consent forms utilized in the case, whether signed or not;

o.  copies of any and all reports related to the booking process in this case;

p.  disclosure of the names and identities of expert witnesses that the government intends to call at trial, their qualifications, subject of testimony, and reports and the results of tests, examinations or experiments which are material to the preparation of defendant's defense or which are intended for use by the government in its evidence-in-chief at trial;

q.  any relevant written or recorded statements made by the defendant and the substance of any oral statement which the government intends to offer in evidence at the trial made by defendant, whether before or after arrest, in response to interrogation by any person then known to the defendant to be a government agent;

r.  copies of all rough notes taken as part of this investigation whether or not they have been incorporated in official records;

s.  a copy of any search warrant or arrest warrant applied for and/or issued or denied during the course of this investigation (whether local, state, or federal); and

t.  pursuant to Rule 12(b)(4) of the Federal Rules of Criminal Procedure, the defendant requests written notification of any evidence the government intends to use at its case-in-chief that may, in any way, be subject to a motion to suppress in which the defendant is entitled to discover pursuant to Rule 16. Although the government has provided extensive discovery, it is unclear exactly what evidence and statements it intends to use at trial.

The defense also seeks the discovery in (u)(i) – (viii), *infra*, regarding the alleged victim, B.G. The defense has received no evidence from the government at all regarding B.G. Mr. White remains as in the dark today about B.G.'s name, employer, work location, job title, and nature of his "official duties" as he was in April 2025. The requested information is essential for Mr. White to assess the validity of and defend against the government's charges.

First, Counts 1 and 2 charge Mr. White with making a threat to an identifiable person, not an anonymous pair of initials. *See* Count 1 ("B.G., a Federal law enforcement officer") and Count 2 ("the person of another . . . an individual known to the Grand Jury"). Even at this basic level of information disclosure, the government has produced no discovery. Second, Count 1 charges Mr. White with violating 18 U.S.C. §115(a)(1)(B) alleging that he threatened "a Federal law enforcement officer, employed by the Department of Homeland Security." 18 U.S.C. §115(c)(1) defines "federal law enforcement officer" as "any officer, agent, or employee of the United States authorized by law or by a Government agency to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of Federal criminal law." The defense has received no discovery from the government regarding B.G.'s employer, job title, or legal or agency authority to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of Federal criminal law. Third, Count 1 alleges that Mr. White threatened B.G. intending to impede, intimidate, and interfere with B.G. "while engaged in the performance of his official duties" and intending to retaliate against B.G. "on account of the performance of his official duties." The government has provided no discovery from the government regarding B.G.'s performance of his official duties during the April 2025 incident which led hundreds of X users to post about B.G.

Lastly, "proof of the effect of the alleged threat upon the addressee is highly relevant" in determining if a communication objectively constitutes a true threat." *United States v. Dennis*, 132 F.4th 214, 230 (2d Cir.), cert. denied, 146 S. Ct. 837 (2025), *reh'g denied*, 146 S. Ct. 1592 (2026) (citing *Malik*, 16 F.3d at 49). Thus, discovery is appropriate regarding the effect of Mr. White's alleged threat upon B.G. Moreover, the government alleged in the Complaint that B.G. "has been directly impacted by the defendant's posts. [B.G.] became aware of the posts referenced above shortly after they were publicly posted, and these online

30

threats have affected and impacted daily activities and life." Compl., at ¶ 19. Therefore, the defense requests the following discovery regarding the alleged victim, B.G.:

u.   disclosure of the following information relating to B.G.:

   i.   full name and address;

   ii.   documents sufficient to establish if B.G. has children;

   iii.   employer, job title, and employment status in April 2025;

   iv.   employment records relating to his engagement in or performance of official duties;

   v.   records relating to B.G.'s status as a federal law enforcement officer in April 2025, i.e., that he had authority to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of Federal criminal law.

   vi.   social media platforms and profile names for which B.G. had accounts from April 2025 and through the time when B.G. "became aware" of Mr. White's posts;

   vii.   devices on which B.G. communicated regarding news coverage of or reaction on social media to his engagement in or performance of his official duties in April 2025, including but not limited to Mr. White's posts; and

   viii.   The results of any forensic analysis of the alleged victim's phone or social media accounts which include a record of conversations or interactions between B.G. and any other individuals regarding news coverage of or reaction on social media to his engagement in or performance of his official duties in April 2025, including but not limited to Mr. White's posts.

## V.   MOTION TO COMPEL DISCLOSURE OF *BRADY/GIGLIO* MATERIAL

Mr. White moves for an Order compelling the government to disclose all potentially favorable evidence, including, but not limited to: statements, grand jury testimony, witnesses, books, papers, reports, photographs, handwritten notes, synopses of statements made by witnesses, or any other tangible items of evidence in the custody and control of the

government or any governmental agency or agents working with or under the supervision of the government. *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Agurs*, 427 U.S. 97 (1976); *United States v. Giglio*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959).

The right to disclosure of all potentially favorable or exculpatory evidence exists whether such evidence is material either to the defendant's guilt or to the mitigation of his punishment, and regardless of whether such exculpatory evidence would be admissible on the defendant's behalf at trial. Evidence which may serve to impeach the testimony or credibility of a prosecution witness falls within the *Brady* doctrine, since it consists of information favorable to the accused. *Giglio*, 405 U.S. at 150.

Due process requires that the defense be given *Brady/Giglio* material in advance of trial so that investigatory leads may be pursued in sufficient time to permit full preparation of the defendant's case. *United States ex rel. Lucas v. Regan*, 503 F.2d 1, 3 n.1 (2d Cir. 1974), *cert. denied*, 420 U.S. 939 (1975); *Arizona v. Youngblood*, 488 U.S. 51 (1988); *United States v. Agajanian*, 852 F.2d 56 (2d Cir. 1988); *United States v. Bejasa*, 904 F.2d 137, 140-141 (2d Cir. 1990); *Grant v. Alldredge*, 498 F.2d 376 (2d Cir. 1974).

The government has not disclosed to the defense any statement from the alleged victim in this case (referred to in the indictment as "B.G."), although the affidavit underlying the Complaint asserts:

> I have spoken with the federal agent the defendant referenced when stating "I can't wait to put a bullet into this guy's brain, but first his children" . . . . **[B.G.] has been directly impacted by the defendant's posts. [B.G.] became aware of the posts referenced above shortly after they were publicly posted, and these online threats have affected and impacted daily activities and life.**

Compl., at ¶ 19.

Mr. White requests that the following information be immediately turned over to defense counsel:

a.  Any prior statements from, or written conversations (e.g., email, text messages, social media posts, or other electronic communication method) involving the alleged victim in this case (referred to in the indictment as "B.G."), in which B.G. referenced, represented, or alluded to activity on X or any other social media platform arising from or relating to his engagement in or performance of his official duties in April or May 2025; including but not limited to:

    i.  Any evidence *inconsistent* with the alleged statements.

b.  The results of any forensic analysis of the alleged victim's phone or social media accounts which include a record of conversations or interactions between B.G. and any other individuals regarding the alleged threat.

c.  Any written or recorded statements, admissions or confessions made by any witness, and the name and address of any such individual, which may be exculpatory, non-incriminatory, or otherwise favorable to the defendant, or any summaries, synopsis, notes, memoranda, or resumes thereof, regardless of whether such statements are reduced to writing and regardless of whether the prosecution intends to use such statements at the trial herein;

d.  The name and address of any other witness who might have favorable evidence as to the defendant, which are known, or which by the exercise of due diligence shall or should become known to the government;

e.  Any notes, memoranda, summaries, reports, or statements of any kind prepared in connection with the investigation of this case which are in any way favorable to the defense including notes prepared by the government or any of its agents in connection with either the review of documents or the interview or other conversations with witnesses or other individuals contacted in connection with this case;

f.  Any and all prior criminal records of any witnesses intended to be used in any fashion by the prosecution, or any other such information demonstrating the commission on their part, or participation therein, of any so-called "bad acts" or other instances of immoral or criminal conduct, or conduct indicating a lack of veracity;

g.  Any and all statements, memoranda or other similar notations or information which would in any way reflect inconsistent statements made by any witness contacted by the government, or any such individual engaged in lying or other conduct calculated to conceal the truth or improperly reflect facts;

h.  Any information tending to indicate that information supplied by a particular document or witness contradicts or is contradicted by a different document or witness; and

i. Any and all surveillance reports of the defendant and any witness covering the period of time relevant to the offenses charged which qualify as *Brady/Giglio* material.

### Timing of the Disclosure

These duties impose on the government an obligation to make such disclosures to aid the accused in his preparation for trial, but also in his determination of whether or not to plead guilty. As stated by the Second Circuit in *United States v. Avellino*, 136 F.3d at 255:

> The government's obligation to make such disclosures is pertinent not only to an accused's preparation for trial, but also to his determination of whether or not to plead guilty. The defendant is entitled to make that decision with full awareness of favorable material evidence known to the government.

*Id.* (*citing Tate v. Wood*, 963 F.2d 20 (2d Cir. 1992)).

As such, this information should be disclosed immediately as well as all favorable evidence discovered hereafter.

### Ongoing Duty to Disclose

Although "[t]here is no established procedure for the due process disclosure required by *Brady*[,] [t]he information should be given to the defense as it becomes known to the government . . . ." *Kyles v. Whitley*, 514 U.S. 419, 440 (1995).

### Reservation of Rights

Counsel specifically reserves the right to make additional requests for the material covered above at the time this motion is argued, or at such other time as the existence of such materials shall become known to counsel for the defendant, and it is respectfully requested that the prosecution be admonished that its duty under *Brady/Giglio* is a continuing one.

## VI. MOTION FOR DISCLOSURE OF INFORMANT INFORMATION

Mr. White moves for disclosure of the names, addresses, and criminal records of all informants, if any, utilized by the government in its investigation of this case. In *Roviaro v. United States*, 353 U.S. 53 (1957), the Supreme Court held that a government informant's identity must be revealed where the defendant has demonstrated that disclosure is necessary to insure the defendant's right to a fair trial. Where the "disclosure of an informant's identity . . . is relevant and helpful to the defense of the accused, or is essential to a fair determination of a cause, the privilege [of non-disclosure] must give way." *Id*. at 60-61.

The information is also discoverable where the informant witnessed or participated in the criminal transaction or when the information is favorable to the accused, irrespective of whether the government intends to call the informant as a witness at trial. *Id*.; *United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003); *United States v. Gil*, 297 F.3d 93 (2d Cir. 2002).

If the government used informants in this case, disclosure of that information is essential to a fair determination of the charges filed against Mr. White. Accordingly, the defense requests the names, addresses, and criminal records of all informants utilized by the government in its investigation of this case, whether or not the government intends to call those informants to testify at trial.

In addition, the defense demands the following information about all informants:

a.  all evidence affecting the issues of bias or credibility;

b.  their criminal records, *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980);

c.  all promises or consideration of any kind given to the informants, *Giglio v. United States,* 405 U.S. 150 (1972);

d.  identification of the informants' prior testimony, *Johnson v. Brewer*, 521 F.2d 556 (8th Cir. 1975);

e.  evidence of psychiatric treatment of each informant, *United States v. Lindstrom*, 698 F.2d 1154 (11th Cir. 1983);

f.  evidence of informants' narcotic habits, *United States v. Fowler*, 465 F.2d 664 (D.C. Cir. 1972); and

g.  whether the informants are being compensated, including favorable plea agreements, in return for their cooperation with the government, *United States v. Morell*, 524 F.2d 550 (2d Cir. 1975).

The inherent unreliability of the testimony of an accomplice or government informant underscores the need for complete disclosure of information relating to credibility. *See United States v. Bagley*, 473 U.S. 667 (1985); *United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003); *United States v. Gil,* 297 F.3d 93 (2d Cir. 2002).

## VII.  MOTION FOR DISCLOSURE OF EVIDENCE PURSUANT TO EVIDENCE RULES 404(B), 608, AND 609

Pursuant to Federal Rules of Criminal Procedure 12(b)(4), (d)(1) and (2) and Federal Rules of Evidence 104(a) and 404(b), Mr. White respectfully requests that the government notify him of any evidence that the government contends would be admissible under Rule 404(b) of the Federal Rules of Evidence.

In order to permit Mr. White the opportunity to file appropriate motions prior to trial, he requests that he be fully apprised of "evidence of other crimes, wrongs, or acts" or transactions involving the defendant which are outside the scope of the indictment and which the government will seek to introduce to demonstrate "motive, or absence of mistake or accident." Fed.R.Evid. 404(b). This circuit has recognized that uncharged acts that will be offered as evidence of a conspiracy should be treated as Rule 404(b) material. *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996).

The defense should be put on notice of the exact nature of this evidence, the witnesses pertaining thereto, the documents in support thereof, and the theory upon which the government asserts that admissibility rests. By so notifying the defense in advance of trial, the defendant can file appropriate motion(s) *in limine* prior to trial and afford the Court the occasion to make pretrial determinations regarding the admissibility of any potential Rule 404(b) evidence proffered by the prosecution. The pretrial determination of this evidentiary question will serve the smooth operation of the trial, eliminate possible extraneous objections, and assist both the government and defense counsel in the presentation of evidence.

### Federal Rule of Evidence 608

Mr. White also requests, pursuant to Rules 608 and 609, pre-trial disclosure of any and all evidence the government intends to use to impeach his credibility if he should choose to testify. In the event the government intends to use such evidence, Mr. White requests a pretrial hearing to determine the admissibility of such evidence.

Rule 608(b) allows use of specific instances of misconduct against a witness. In the event the government intends to use specific instances of misconduct against Mr. White if he testifies, it is requested that such instances be disclosed prior to trial.

Due process also requires that such material be provided to the defense prior to trial to aid Mr. White in deciding whether to proceed to trial or accept a plea. The Second Circuit has suggested that this information should be produced at this stage in the proceedings. *See United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998).

### Federal Rule of Evidence 609

Rule 609 of the Federal Rules of Evidence allows for use of certain prior convictions to impeach the credibility of the defendant, should he testify at trial. The defense requests notice of any intent to use such information.

## VIII.  MOTION FOR EARLY DISCLOSURE OF JENCKS ACT MATERIAL

Mr. White moves for disclosure of witnesses' statements pursuant to 18 U.S.C. § 3500 ("*Jencks* Act") and Rule 26.2 of the Federal Rules of Criminal Procedure. A defendant is entitled to each witness statement after the witness has completed his or her testimony on direct examination. The Second Circuit has interpreted this statute to include a substantially verbatim statement of a witnesses' words as recorded by a government agent if they could fairly be deemed to reflect fully and without distortion what had been said to a government agent. *United States v. Scotti*, 47 F.3d 1237, 1249 (2d Cir. 1995). The Supreme Court has made it clear that there is no difference between impeachment and exculpatory evidence under the *Brady* rule. *United States v. Bagley*, 473 U.S. 667 (1985).[28] As such, any requests made herein which also fall under *Brady* and its progeny shall be a request for their immediate disclosure.

Pursuant to Rule 26.2 of the Rules of Criminal Procedure, the *Jencks* Act is applicable to pre-trial suppression hearings, sentencing hearings, revocation or modification of supervised release and probation hearings, detention hearings and preliminary examinations.

Mr. White therefore moves for an order requiring production of *Jencks* Act materials, namely all statements and reports in the possession of the United States which were made by government witnesses or prospective government witnesses and which relate to the subject

---

[28] The *Jencks Act*, which provides that no statement made by a Government witness shall be discoverable until after the witness testifies, would appear to preclude any pretrial disclosure of *Brady* material. *Brady*, however may "override" the *Jencks Act* in highly prejudicial circumstances. *See United States v. Starusko*, 729 F.2d (fn1 cont.) 256, 263 (3d Cir. 1984) (". . .compliance with the statutory requirements of *Jencks Act* does not necessarily satisfy the due process concerns of *Brady*"), *citing United States v. Campagnuolo*, 592 F.2d 852, 858-60 (5th Cir. 1979).  The rule enunciated in *Brady* is a constitutionally compelled rule, and Justice Stevens' advice is worth heeding:  "Because we are dealing with an inevitably imprecise standard and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108 (1976).

matter about which those witnesses may testify, as per the *Jencks* Act, 18 U.S.C. § 3500, and

Rule 26.2 of the Federal Rules of Criminal Procedure.

a. The term "statements" shall include:

   i. any written statement made by a witness and signed or otherwise adopted or approved by him;

   ii. any electronic communications exchanged by law enforcement during the investigation of Mr. White, involving the investigation, including but not limited to text messages communicated on or about June 4, 2025 when law enforcement first interviewed Mr. White, for example:

   iii. stenographic, mechanical, electronic or other recording, or transcriptions thereof, which are a substantially verbatim recital of an oral statement made by a witness and recorded contemporaneously with the making of such oral statement;

   iv. a statement, however taken or recorded, or a transcription thereof, if any, made by a witness to a grand jury;

   v. records of statements made to a government agent which fairly and fully reflect the statements made without distortion, *United States v. Scotti*, 47 F.3d 1237 (2d Cir. 1995);

   vi. any and all rough notes of witness interview(s) taken or obtained in any investigation of the defendant including federal, state, local, and other investigations whether or not the contents thereof have been incorporated in official records;

   vii. any notes and memoranda made by government counsel during the interview of any witness(es) intended to be called by the government in their direct case, *Goldberg v. United States*, 425 U.S. 94, 101-108 (1976); and

   viii. all surveillance reports made or adopted by a witness, *United States v. Petito*, 671 F.2d 68, 71 (2d Cir. 1981).

**Timing of Disclosure**

In addition to avoiding unnecessary delays, sufficient pre-trial delivery of *Jencks* material also ensures that Mr. White's fundamental right to a fair trial and due process of law are safeguarded. Therefore, Mr. White seeks production of the statements prior to trial for the purposes of judicial economy, to expedite discovery and the trial of this case, and to avoid

potential problems on the issue of whether all material has been tendered pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. Although a District Court may not ordinarily compel disclosure of *Jencks* material prior to the conclusion of a witness' direct examination, early disclosure of *Jencks* material obviates trial interruptions and permits defense counsel to study the disclosures. *See United States v. Campagnuolo*, 592 F.2d at 858 n.3. Courts have, on a case-by-case basis, invoked their discretion to require production of *Jencks* Act statements in advance of the trial so that unnecessary delays will not take place during the course of the trial. *See, e.g., United States v. Percevault*, 490 F.2d 126, 132 (2d Cir. 1974); *United States v. Feola*, 651 F. Supp. 1068, 1139-40 (S.D.N.Y. 1987).

## IX.    MOTION FOR PRESERVATION OF ROUGH NOTES

Mr. White moves for an Order of this Court requiring all federal, state, or local agents and officers who participated in the investigation of the defendant to retain and preserve all rough notes taken as part of their investigation, whether or not the contents of the notes are incorporated in official records. This motion is made so that the trial court can determine whether disclosure of the notes is required under *Brady*, *Agurs, Giglio*, the *Jencks* Act (18 U.S.C. § 3500), Rule 26.2 of the Federal Rules of Criminal Procedure, and/or the Fifth and Sixth Amendments of the United States Constitution. The defense also requests that this Court direct the government to preserve notes made by government witnesses, including state and local authorities, in the event they later became discoverable as either the defendant's statement, or that of another witness. *United States v. Scotti*, 47 F.3d 1237 (2d Cir. 1995).

Simply labeling notes as "rough notes" does not minimize the government's duty to produce them. For example, in *Williams v. United States*, 338 F.2d 286 (D.C. Cir. 1964), the

court stated that notes containing abbreviations, idiomatic language or phrases set off in quotations may be deemed to be a substantially verbatim recital of the witness' statement.

This motion puts the government and its agents on notice that any and all rough notes referred to above should be preserved. Any destruction of notes after this request for preservation cannot be claimed to have been made in good faith. *See United States v. Koskerides,* 877 F.2d 1129 (2d Cir. 1989); *United States v. Elusma,* 849 F.2d 76 (2d Cir. 1988); *United States v. Sanchez,* 635 F.2d 47 (2d Cir. 1980); *United States v. Bufalino,* 576 F.2d 446 (2d Cir. 1978).

## X. LEAVE TO MAKE FURTHER MOTIONS

Mr. White respectfully reserves the right to make additional motions, including a motion to suppress evidence and statements, as the factors and evidence emerge through requested disclosure. The specific requests contained in these motions are not meant to limit or preclude future requests by Mr. White for further relief from this Court as appropriate. Mr. White requests that this Court grant such other and further relief as is just and proper.

**WHEREFORE**, Mr. White respectfully requests that the Court issue an Order granting the foregoing relief.

DATED:                                      Buffalo, New York, July 17, 2026

                                            ***James E.B. Bobseine***
                                            ***Timothy P. Murphy***
                                            Assistant Federal Public Defenders
                                            Federal Public Defender's Office
                                            300 Pearl Street, Suite 200
                                            Buffalo, New York 14202
                                            James_Bobseine@fd.org
                                            Timothy_Murphy@fd.org

**TO:**    Evan K. Glaberson
        Assistant United States Attorney